Good morning, Your Honors. May it please the Court, Andrew Sabe on behalf of the Tahoe Regional Planning Agency. It is my intention to reserve three minutes, so I will endeavor to do that. Your Honors, what the agency has brought before this Court today is a very narrow issue, but it's also a very important issue to the agency, and it has to do with restoring to the agency the discretion that virtually every administrative agency would expect to enjoy in the terms of exercising the discretion to establish an environmental baseline when it commences environmental review in support of a project or an amendment. Well, it still has to be supportable by the record or rational. Absolutely. So it is not unfettered discretion ever, and there is no discretion to be arbitrary and capricious, and there is no discretion to proceed without any substantial evidence. But the real question is not, in this case, whether the agency can do a better job. As the Court understands, the appeal here is limited strictly to the edict, the mandate by the district court that imposed upon this agency a specific baseline to go back and use this fact, which is not even a fact, right? It's a hypothetical. You don't have the discretion to do that. So if the baseline selected was arbitrary and capricious and improper under the agency standard, go back and stir it over and come up with something that makes more sense and left it to your discretion to come up with something that makes more sense? Your Honor, it's – I think that that is sort of a hybrid between the invasion  Well, I guess what I'm trying to get at is, do you – are you quarreling just with the nature of the remand, in which case our task is very small, or are you quarreling with the conclusion that the selected baseline was not permissible? It is both, Your Honor. It is both that the court – the district court's conclusion that the selected baseline was impermissible is incorrect. Well, I guess to me – let me just tell you how I think about it, and you can tell me where I'm wrong in this. The question is whether the unauthorized buoys have an impact or don't. I mean, that's one of the questions that's to be answered. Certainly, A, that's the question. And if you define the baseline as starting with all of them there, then you've defined yourself out of even the theoretical possibility that the unauthorized buoys can have an impact. Untrue, Your Honor. That's absolutely untrue. Why? And I appreciate the question because that really crystallizes the mistake that the district court made here that the plaintiffs are trying to capitalize on. What – the baseline in every – every environmental setting in all of CEQA law, in all of NEPA law, is the existing physical conditions, unless there is some good reason to deviate from that. That is typically imposed by the agency itself because it says I can express this better to the public if I impose upon myself a different baseline than the existing conditions. So normally – Well, let me – let me follow that up. Okay. So your position is the baseline is supposed to be ordinarily what exists now, regardless of whether it's good, bad, or indifferent. So if the baseline includes – I'll just use a wrong but arbitrary number – 100 unauthorized buoys, how do you determine whether those 100 unauthorized buoys have an adverse environmental impact if you're starting with the baseline where they are now? In other words, is it – is it possible and how would it work to say, okay, this is the baseline, but these 100 have an adverse impact even so – I don't understand how that would work. Right. Absolutely, Your Honor. Well, let – and that's to – sort of makes the point as to why the agency is supposed to have the discretion to do this, because the agency knows how to make that work. Well, I'm – if you can't explain to me how it can work, you're going to have a problem instilling me – showing me that it's not arbitrary and capricious. Let me. Because what the court is describing is addressable through any number of other devices available in the environmental review process. You start with a baseline. Can – you still haven't answered my question as to whether there can be an adverse impact in that situation, or is it always going to be no adverse impact? Well, the – it's not the adverse – you don't start with saying in an environmental baseline there's an adverse impact. You start with saying this is where we are, and we have a project to consider. We have some policy decisions to make about where we want to go, and we have to look at the difference between where we are and where we want to go, and the delta between those two, and the policy choices in that, right? Because one of the things that the agency proposed is we want to reduce – at the end of this shore zone amendment process, our goal is to reduce the number of buoys currently on the lake, right? That could have been an alternative, and it is an alternative, as it turns out. In the EIS here, there was an alternative five that said, well, what if we use as a comparison to the preferred project, right? We need to look at a full range of alternatives. One is let's reduce the number that are currently out there, and we will compare the difference between that approach versus allowing an incremental increase with the mitigation that was imposed upon them. So that's one very good way. Another way, Your Honor, that's tried and true and quite routine is in just the impact analysis. Let's talk about where we are today. Let's talk about there's 4,454 buoys on the lake. What impact are they having? We need to set our baseline. We need to talk about what contribution is the associated boating making to the lake and what makes sense for us to achieve. And if they don't do a good job, and I'm not here to defend the adequacy of the record, as you know, we're not here to say you need to reverse the district court that said go back and do this better. We're strictly here to say the agency has the ability through all these other devices. It is not a baseline question, and that's the real problem here. Can I jump in? Has the agency already set maximum acceptable levels of pollution in order to clean the water? For example, have they set a maximum tonnage on nitrous oxide deposits into the lake beyond which we just can't accept anymore? Well, they have those kinds of standards. What they have are, yes, I mean, yes, and they have environmental threshold carrying capacities, and they have separate obligations. Separate and apart from the environmental impact statement, what this agency has is a duty to try to improve the conditions there, to reduce the adverse impacts that have been visited upon this lake, and to get it to a state where it meets these aspirational thresholds that were set for it. So it has overarching goals to improve the conditions there, to reduce the impacts, and that... So when we talk about a baseline, are we then comparing as we either move above or below the baseline? And I'm assuming above means adding more buoys and doing whatever mitigation measures will be adopted versus reducing the number of buoys on the lake. Will we be comparing where we are once that project is complete with these standards, I will call them, for clean water in the lake? Absolutely. Right. So, yes, the goal... And it's a separate... That's a separate process, but it's absolutely codified. It's in the compact, and it's part of the code that they need to... And this is part of the myth of fixating on baseline. Regardless of what the baseline is, at the end of the shore zone amendment process, you have a number that you are saying is either permissible or what you're going to achieve, right? And you have to test that condition, that endpoint. Are we... If we make this policy choice of allowing X number of buoys under these conditions with this mitigation, are we achieving and maintaining thresholds? Are we making steps toward doing that? If you cannot make that finding, and there is no substantial evidence to support that finding, and you're challenged, you should be sent back. So, is your complaint with what the district court did here... The district court told you what baseline he wanted. He wanted a baseline that eliminated 1,000 unpermitted buoys. More, yes. Okay. More than that? Yeah. And then, if you start with that baseline, which I assume is a hypothetical baseline, because we haven't removed those unpermitted buoys yet, aren't we still going to have to be in a state of affairs with these... I'll call them water quality standards, for want of a better term. Absolutely. Yes. And that's what, frankly, de-emphasizes from the ultimate decision-making process for the agency, the baseline is just that. It's a baseline. We need to start with reality, examine where we are, be honest about what we're trying to accomplish, and it's the end point that requires our comparison with what our overarching duty in terms of improving lake quality, and you test that. You test, if I make this policy choice of allowing more buoys or not allowing more buoys, with the suite of mitigation in the context of everything I'm doing, it's kind of a cumulative impact, right? Right. If I do that, have I met my overarching goal of improving and meeting these thresholds? And if you can't make that finding, supported by the scientific evidence, then you should not be allowed to proceed. All right. Then let me ask this question. We know where we are today, do we not? We have 4,454 buoys, and that correlates to however many boating events there are in the lake, and you can compute the number of deposits of whatever element you want to focus on. Can't we say today whether or not we're meeting the water quality standards that have been set based on current usage? Right. And are we in compliance? My guess is we are not. Right. So the boating is just the problem is that the boating is such a tiny component of what impacts that lake. It's mostly runoff, right, from surrounding development. That is prohibitively the largest contributor. So it's unfair to attribute grave significance to this small piece, and so it's sort of outsized in terms of saying, well, you've got to, you know, pretend those boats aren't there, and then everything will be okay. No. Could I ask you to specify, the district court wrote about 70 pages worth, and you started by saying that most of it you don't challenge on appeal. Can you specifically point to the passage or passages in the district court's opinion that you want us to change or change or overrule? Yes. Absolutely, Your Honor. Thank you. There is an extended discussion in here on baseline and the district court's analysis, but to cut to the chase, there is a passage at the bottom of page 30 to the top of page 31, page 30, lines 23. 30 of the opinion or 30 of the ER? I'm sorry. Either one is fine. I've got it in front of me. 30 of the opinion. It's excerpts of record at 38. Okay. At line 23. And what follows the statement, and I can just read it just so we're all on the same page, if you will. For these reasons, the Court concludes that the EIS's use of the number of existing buoys rather than the number of existing buoys authorized by TRPA as the baseline was contrary to the compact and therefore arbitrary and capricious, close quote. Now, what we see there, that statement has to go. And what we've argued in our briefs is when you look at the alternative that the district court provided in footnote 13. Yes. We've said, okay, we can live with footnote 13 because that's the proper separation of powers. The Court says you failed as an informational document. You failed to articulate. We can meet that standard because there is every manner of ways for us to improve with the disclosure and discussion. But don't tell me what my baseline is reaching out from Sacramento to tell me what to do. Okay. Is there anything else that has to go in your view to make this an acceptable conclusion? There's a similar error at the bottom of page 22, excerpt of record 30, 23 through 25. But really, I think the page 30 line is really just summarizing. And I think that's a good point, because what we've said is we're willing to go back, but we want to go back and do it the way that we believe is correct within our discretion. So the parties have argued massively before us, but I want to really be sure I understand this, because if what this panel were to do, and I'm just asking this, I'm not suggesting that anybody necessarily thinks this is a good idea, but if all that we did was to say that for the reasons explained in the appellant's briefing, the material at pages excerpts 38 and 39 are excised and in their place. Footnote 13 is an alternative method of returning this. You'd be happy. Yes. Okay. Thank you. It's not much ado about nothing, but it is a very narrow discussion. No, I know that, because I know it's much ado about something. Thank you. Thank you. Good morning, Your Honors. My name is Wendy Clark, and I represent the League to Save Lake Tahoe and the Sierra Club. This morning, I want to clarify what the precise issue in this case is. The issue in this case is whether TRPA can authorize a significant number of buoys without ever having studied their impacts and without ever having provided any mitigation for those impacts, simply because those buoys will replace existing illegal buoys on a one-for-one basis. Okay. I understand that you phrased the issue differently, but let me ask you what I just asked opposing counsel. If the only thing that this panel fiddled with was the paragraph that says, for these reasons that counsel read, and in its place, the alternative holding in footnote 13 sent this back, that doesn't touch, I think, the district court's discussion of mitigation and the need to deal with mitigation differently. So would that also be satisfactory to you? No, Your Honor, it would not be satisfactory. Why? Because the agency is claiming that it has discretion to determine the baseline. But the problem is that the authorization of this number of illegal buoys is part of the project, and it can't be included within the baseline if it's part of the project. Under the Friends of Yosemite v. Kempthorne case, which this Court decided, a baseline is meaningless if it includes the very plan being proposed. There's no way of getting around studying the effects of a project if the project is included within the baseline. It just doesn't make any sense, and I think that's why Your Honor had Judge Graber had some trouble as to how you could actually look at the impacts of the number of illegal buoys if they were actually included in the baseline. But as a practical matter, what's the difference between an unpermitted buoy and a permitted buoy right now in the lake? The question is not the number of buoys. It's the number of boats that are on the lake, right? Yes, Your Honor. Well, the buoys increase the number of boats on the lake. Exactly. So it does make a difference. So what's wrong with starting, as the agency has done, with as the baseline, which is not the environmental standard, it's just where we are today, and then determining on a going-forward basis whether, with significant mitigation measures, unpermitted buoys can be removed and perhaps replaced by permitted buoys with attendant mitigation measures, or perhaps the answer is going to be we have to reduce the total number of buoys in the lake and reduce the amount of boats using it. I mean, I just don't understand why you guys are fighting so hard over having the court tell the agency what baseline it should begin with. Well, the problem is that the buoys that are illegal right now that currently exist on the lake, those buoys, the impacts of those buoys have never been looked at and have never been mitigated. And I think what CHRP is … Associated boating events with a certain number of buoys? I'm sorry, I don't know what chart you're referring to. I don't understand your answer. The chart in the record that showed of the various alternative proposals that the agency considered listed varying numbers of buoys that might exist, depending on which alternative was chosen. And with those numbers of buoys, they figured out how many boating activities and how many tons of nitrous oxide would be deposited. So I don't understand your answer when you say that they're not taking the unpermitted buoys into account. It seems to me that they are. As far as I know, those unpermitted buoys have never been – the impacts of those buoys have never been studied. I'm sorry. Maybe this case is a lot more simple than I'm able to discern. But I don't understand what the difference is in the impact on the environment between an existing unpermitted buoy and an existing permitted buoy. They both have a boat associated with them, maybe more than one boat, I don't know, and so many boating events that occur, running about on the lake and depositing pollutants. And it seems to me those are all accounted for when you're talking about the total number of buoys on the lake. So why is there a difference? Because the problem is that the agency has allowed this – some portion of the 4,454 buoys to accumulate on the lake illegally. Well, some of them are there because they existed before 1972. Is that right? When there was no regulation. That's correct, but there's no accounting of which buoys are which. There's no accounting of how many buoys are illegal and how many are supposed to be there as authorized by TURPA or how many were placed in the lake before 1972. But part of the plan is to go around and, I guess, identify each unauthorized buoy and then either force the owner to meet the terms of the ordinance or it will be removed.  It will not just be removed, Your Honor. It will be replaced with a new buoy. And the problem is that that perpetuates future harm to the lake without studying the effects of that harm. How do we know that? I mean, we're talking about a baseline here, so we've got to start somewhere. And this is where I'm finding it very difficult to understand what this fight is all about. You've got to have something to compare progress to. And it's either going to improve the quality of the water or it's going to denigrate the quality of the water. But you can't know that unless you have a starting point. I agree that we need a starting point. And the baseline should reflect the existing conditions. But the district court, as the district court recognized, the baseline can reflect both the existing conditions and the damage that has already been caused by these illegal buoys as well as the agency's duty to prevent any further degradation and its duties and its responsibilities to... Do you agree with my question of your opposing counsel? Are there standards that have been set with regard to the turbidity of the water, the total amount of tons of nitrous oxide that can be deposited? Isn't that the standard that we're trying to determine whether we're achieving? There are overarching standards, as Mr. Sabe pointed out. And as the agency implements this plan, if they start with the baseline of this is where we are today, aren't they going to be measuring their progress or lack thereof against whether they're able to meet those standards? I mean, it's either going to get better or it's going to get worse. And if it gets worse, presumably the agency will take action to remove buoys, if that's the culprit. I don't know. I mean, it's a complicated issue because, as I understand it, there are a lot of contributors to the pollution of the lake, including runoff from the soil surrounding the lake. The problem, Your Honor, is that so TARPA is asserting that this question can be dealt with with the threshold findings under Code Section 6.5, whether the plan actually achieves the standards. But those findings are informed by the environmental impact statement. The environmental impact statement is supposed to assess the effects of the project and how much further pollution these newly authorized buoys will contribute to the lake. And the problem is that the illegal buoys were swept under the rug. There wasn't any study of the further impacts of those new buoys going forward. And so you can't have reliable threshold findings as to whether the standards are going to be met if you have no accounting of what those newly authorized buoys are going to contribute to the lake. Can't we achieve the result that you are asking for by doing what Judge Graber got your opponent to concede would be an acceptable resolution of this appeal, a declaration that the currently existing choice of the baseline is arbitrary and capricious because the agency needs to explain this better and send it back? Why do we have to tell the agency, we as federal judges are going to tell you what your baseline will be? Because we know better than you do. The problem is that there isn't any discretion in this question because this is part of the project. The replacement of buoys that should have never been there in the first place. But if they have to explain themselves more thoroughly, either they will be unable to do so and you will be successful, or they will be able to do so. But it just seems to me that in a sense you're asking for something prematurely. If the agency hasn't explained why things fit together, which is what footnote 13 talks about, if they haven't explained themselves, then maybe none of us know how they will explain how this all fits together. It seems to me the agency and the materials that have been submitted is contemplating not only replacing unauthorized buoys but adding additional ones when you count them as 6,000 plus. Is that correct? Yes. That's their goal. That's one of their goals, correct? I'm sorry. Is that the goal of the agency in exploring this problem, that they want to replace with authorized those that are unauthorized, plus add additional authorized buoys? Right. They are going to be replacing the illegal buoys on a one-for-one basis, and then they will be adding an additional 1,862 buoys on top of that. And those 1,862 buoys, the agency did study the impacts for, but the 1,000 plus additional buoys that are going to be authorized, there's no accounting for what those impacts are and whether there's any adequate mitigation for those buoys. That's the problem. That's a separate question on the baseline, because no matter what baseline, those new ones are going to be new. Those buoys, though, are perpetuating future harm that would not have been allowed in the first place, because TRPA had a duty to remove buoys as they were placed in the lake. It seems to me what you're doing is you're trying to equate the baseline with water quality standards. And in essence, I think your position boils down to we don't want to see any additional buoys on the lake. There are too many now, and we want less. Is that your position? No, Your Honor. That's not our position. Our position is we want to know what the impacts of these unknown number of illegal buoys is, because they haven't studied that. If we do what we've been toying with here and we send it back, isn't the agency going to have to explain that better? Because you say they haven't done it at all. And then to the extent that they don't do it to your satisfaction, as I read the compact, you can bring another lawsuit and challenge what they do after the remand, and then we'll see whether or not their justification for whatever baseline they choose is supported by the evidence or not. Well, Your Honor, I think that that is a possible outcome, but I think that it would be much more efficient for us to resolve the question today. By telling them what? That the baseline must be what? What do you want the baseline to be? That it must exclude the number of unauthorized buoys or illegal buoys as the district court held. And that's because that is part of a project. And under Friends of Yosemite, to study the project, you can't include the project in the baseline. It just doesn't make any sense. But don't you have to do that on a hypothetical basis? Because the buoys exist today. And if we went and removed all of them, then I guess we could measure what the impact is after they're gone. Well, I don't think that there's anything really hypothetical about it, because just as all we want to do is look at what the impacts of those buoys are going to be going forward. And with the 1,862 buoys that TRPA explicitly acknowledged that they were going to authorize, those buoys they did study the future impacts of. But with that portion, the 1,000 plus, nobody knows. I mean, we haven't actually looked at that. You keep saying that, but aren't the numbers driven by the total number of buoys that are on the lake? Isn't that how the agency computes the, I'll call them the number of voting events associated with each buoy? I mean, this is not rocket science. I agree it's not rocket science. I think that possibly TRPA looked at the entire total, but it's also possible that they ignored the impacts of that number of illegal buoys that are going to be authorized. And so that's the problem here that we're concerned with. Thank you, counsel. You have used up your time, and you can have a sentence or two to sum up if you'd like. Okay. Well, I just want to say that we don't think that TRPA has presented any reason justifying reversal of the district court's order and that the district court presented a well-reasoned opinion, and we respectfully request that the court affirm that opinion. Thank you. Thank you very much. And you have a little bit of rebuttal time remaining. Thank you. Yes, Your Honor, I have eight seconds. That counts as very little. We'll give you a minute. Hit me in the door, right? Okay. I would say that the questions from the panel, I think, have actually relatively articulately identified the small remand change that we're looking for here. We are not looking to sweep anything under the table. And as the Court has acknowledged, what has to be done here is it all has to be studied. The future condition has to be studied. Nothing is going to escape study in this case. Nothing is going to be done here. Including the replacement of existing illegal buoys? Well, certainly, because what happens is those are going to be counted, right, as a continuation of a condition. And if it's contributing to the denigration of those qualities, even with all the mitigation, it's going to be included in whether or not we are doing the right thing here or not. There's no getting away from it. I think, as Judge Tallman said, they're there now. They are being used now. There's 4454 on the lake now. We know that. And we know what our standards are that we are aiming at. And we are trying to figure out all of the contributors to those things. And so they will be part of that calculation that the agency does to figure out whether it's meeting its ultimate standards. Thank you, counsel. Can I ask one question? Yes. Go right ahead. Would you agree with this, sir, that on appeal, TERPA is only challenging the district court's conclusion that the use of all existing buoys as a baseline rather than only the authorized buoys was contrary to the compact and therefore arbitrary and capricious? Would I agree with that statement? I agree with that's the issue that we have to deal with. That's a limited issue on appeal. Right. If we can be liberated from having the court tell us what our baseline is so that we can go back and do the information disclosure, do the analysis, and do the findings, then we can work within that. We cannot work with being told to adopt a baseline that does not exist today. Okay. Thank you. Thank you. The case just argued is submitted. We appreciate very much the arguments of both counsel. They've been helpful in this interesting case. And we are adjourned for this morning's session. Thank you. Thank you. Thank you. Thank you.
judges: Timlin, Graber, Tallman